ANGELA ALIOTO, (SBN 130328)
angela@aliotolawoffice.com
Law Offices of Mayor Joseph L. Alioto
And Angela Alioto
700 Montgomery Street
San Francisco, CA 94111
Telephone: 415- 434-8700
Facsimile: 415-438-4638

JOHN SCARPINO, (151377)
Law Office of John Scarpino
700 Montgomery Street
San Francisco, CA 94111
Telephone: 415-516-6147
Facsimile: 415-438-4638

Attorneys for Plaintiff
D'EDRA STEELE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

D'EDRA STEELE, a Texas resident,

Plaintiff

vs.

UBER TECHNOLOGIES, INC., a Delaware Corporation; and DOES 1-10,

Defendants.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:

1. Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101;
2. Violation of the of Texas Human Resources Code § 121.001, et seq.; and
3. Intentional Infliction of Emotional Distress.

DEMAND FOR A TRIAL BY JURY

**INTRODUCTION**

1. Plaintiff D'Edra Steele initiates this action to enforce her right to be free from unlawful discrimination on the basis of her disability in the use and enjoyment of the public transportation services provided by Defendants Uber Technologies, Inc. and DOES 1 through 10. Plaintiff seeks the right, under both the Americans with Disabilities Act, (ADA), 42 U.S.C. §§ 12101, et seq., and the Texas Human Resources Code § 121.001, et seq., to full and equal access to and use of Defendants' transportation services with her service animal.

2. Plaintiff seeks declarative and injunctive relief to stop Defendants' continuous and ongoing pattern and practice of denying Plaintiff equal access to and participation in the transportation services Defendants offer to the general public, solely because of Plaintiff's disability and use of a service animal. Plaintiff also seeks an award of damages pursuant to Texas Human Resource Code § 121.004(b) to compensate her for the harm she has suffered as a result of the deprivation of her civil rights.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188, for claims arising under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq.

4. This Court also has supplemental jurisdiction over the state law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367(a) because Plaintiff's state law claims relate to those claims over which this Court has original subject matter jurisdiction and form a part of the same case or controversy.

5. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) because Defendant Uber is subject to the personal jurisdiction of this Court, as more fully set forth in paragraphs 7-8, below.

## PARTIES

6. Plaintiff D'Edra Steele is an adult resident of Mansfield, Texas. Plaintiff Steele is a person with a disability as defined by the ADA, 42 U.S.C. § 12102 and the Texas Human Resources Code § 121.002(4). Plaintiff Steele has cerebral palsy, a permanent non-progressive disorder affecting muscle strength and coordination that affects Plaintiff's balance and ability to walk. Plaintiff requires a service animal in order to walk and maintain her balance.

7. At all times relevant to this complaint, Plaintiff Steele has used an individually trained dog named Goodee, as a "service animal" as that term is defined by 28 C.F.R. § 36.104 and Texas Human Resources Code § 121.002(1).

8. Defendant Uber Technologies, Inc., (Uber), is a corporation organized under the laws of the State of Delaware. Uber's principal place of business is in San Francisco, California.

9. Defendant Uber provides transportation services to the general public, and is engaged in an industry that affects commerce. Defendant Uber operates a "demand responsive system" as that term is defined by 42 U.S.C. § 12181(4). Defendant Uber is a public accommodation as that term is defined by 42 U.S.C. § 12181(7) (F). Defendant Uber is also a "public facility" as defined by Texas Human Resources Code §121.002(5).

10. Plaintiff is ignorant of the true names and capacities of Defendants sued as DOES 1 though 10, and therefore sues these Defendants by fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when these facts are ascertained. Plaintiff alleges that each of these fictitiously named Defendants is responsible in some manner for Plaintiff's injuries.

11. Plaintiff alleges that Defendants Uber and DOES 1 through 10, are each jointly and severely liable as the principal, agent, master, servant, employer, employee or partner of the other defendants, and in performing the acts complained of herein were acting within the scope of such agency, employment, or partnership.

## FACTUAL ALLEGATIONS

12. Plaintiff Steele has lived with cerebral palsy since birth. Cerebral palsy impairs Plaintiff's balance and motor coordination, as well as her peripheral vision. Plaintiff's disability significantly limits her mobility, making it difficult for Plaintiff to maintain her balance while walking or to navigate up and down steps. Plaintiff is also unable to drive due to her disability.

13. Since 2009, Plaintiff Steele has used a service animal to provide physical support and assistance with balance. Use of a service animal is necessary in order to permit Plaintiff Steele to live as independently as possible. Through the use of a service animal Plaintiff is able to walk safely and navigate up and down steps.

14. At all times relevant to this complaint, Plaintiff Steele has used an individually trained dog named Goodee as a service animal. Goodee provides Plaintiff balance and counter-

balance and provides stability for Plaintiff. Goodee also enables Plaintiff to navigate up and down steps and safely access ramps. Goodee has also been trained to provide Plaintiff with migraine headache alerts and to provide grounding for Post Traumatic Stress Disorder, a condition Plaintiff suffers.

15. Plaintiff depends on access to public transportation and privately owned transportation services, such as the service provided by Defendant Uber, to travel locally to retail establishments and to attend appointments with health care providers, including her primary care physician.

16. Starting in 2016, Plaintiff Steele began using the transportation services provided by Defendant Uber. Defendant Uber operates a demand responsive that provides transportation to individuals by car. The demand responsive system developed and implemented by Defendant Uber offers substantial cost savings over other forms of transportation available to Plaintiff. As a person with a disability living on a fixed income, the cost savings offered by Uber are significant and create a strong incentive for Plaintiff to use Uber's transportation services.

17. Plaintiff accesses Uber's transportation services by using Uber's software which is available as an app on Plaintiff's smart phone. Through its software app, Defendant Uber provides transportation services to the general pubic by arranging rides for passengers in the same manner that a taxi dispatcher arranges taxi cabs for customers. A passenger, such as Plaintiff, uses Uber's app to request transportation from a specific location to a specific destination. The software app identifies the drivers available to provide the transportation and arranges for a driver to pick-up the passenger. The app then notifies the passenger that a ride has been arranged and provides the driver's name, make and model of the driver's vehicle and the estimated time of arrival. The app allows the passenger to track the driver's progress to the passenger's location.

18. Upon completion of the ride, payment is made through Uber's app. Passengers do not pay the driver for the ride. Instead, Defendant Uber automatically charges the passenger's credit card for the ride. The cost of the ride is set by Uber, based on the duration and distance of the ride and other factors determined by Uber's algorithms. Uber then remits payment directly to the driver, keeping a portion of the payment for itself.

19. Throughout 2016 and 2017, Plaintiff Steele was repeatedly denied access to Defendant Uber's transportation services on approximately 25 separate occasions. In every instance, Plaintiff was denied service because of her disability and use of a service animal. Defendant's on-going and continuing pattern and practice of refusing to provide transportation services to Plaintiff has caused Plaintiff Steele financial loss as well as extreme emotional distress.

20. The first denial of service occurred on or about March 19, 2016. Plaintiff Steele used Defendant Uber's app to arrange transportation home from a doctor's appointment. Plaintiff waited outside for the Uber driver to arrive. Plaintiff waited with Goodee, her service animal, who was on a leash and wore a vest indicating she was a service dog. When the driver arrived and saw Plaintiff with a service animal, the driver said, "I've never had a doggie in my car before." Plaintiff tried to explain that Goodee was a service animal, but the driver drove away. Plaintiff called Defendant Uber's critical response line to complain that she had been denied service because of her service animal.

21. Another instance occurred on September 14, 2016. Plaintiff Steele was at a Sprouts grocery store when she used Uber's app to obtain transportation home. After requesting a ride, Uber's app confirmed that her assigned driver, Wong, would arrive in a Toyota in approximately 7 minutes. A few minutes later, the Uber app informed Plaintiff the driver was "arriving now." Plaintiff saw the identified Toyota enter the Sprouts parking lot, come to her location, and then continue on. The driver circled the parking lot and then left. Plaintiff received a text asking, "Dog?" Plaintiff replied with a text stating she had a service dog. The driver's final text stated, "Sorry, it's a brand new car." Plaintiff then received a message from Defendant Uber stating, "Sorry, our driver had to cancel today."

22. Plaintiff was left standing in the Sprouts parking lot with her groceries and Goodee her service dog. Plaintiff became so upset she began to cry and started shaking. Plaintiff required assistance in order to return into the store to charge her smart phone to arrange other transportation home.

23. On at least one occasion, Plaintiff was denied service twice on the same date by two different Uber drivers. On September 30, 2016, at approximately 12:16 p.m., Plaintiff used Defendant Uber's app to obtain transportation home from a local Walmart. Plaintiff received confirmation from Uber's app that a driver was six minutes away. Plaintiff also received a message that the driver had arrived. The Uber driver, Clarence, arrived in a pick-up truck and acknowledged Plaintiff. The driver got out of the truck and lowed the truck bed and indicated that Plaintiff's service animal, Goodee, would have to ride in the back of the truck. When Plaintiff objected, Clarence slammed the truck bed closed, got into the truck and drove away. Plaintiff then received a message from Defendant Uber stating, "Sorry, our driver had to cancel today."

24. After having been denied service once, Plaintiff made a second attempt to access the transportation services offered by Defendant Uber. At approximately 12:40 p.m., Plaintiff used Uber's app to request another ride home from Walmart. Again, the Uber app confirmed that a driver, Robert, would arrive in approximately six minutes. Plaintiff also received a message that driver had arrived. A moment later, Plaintiff received a text message from the Uber driver asking, "Are you the lady with dog?" Plaintiff confirmed she had a service animal. The driver replied with a text stating, "I have allergies sorry." Several minutes later, Plaintiff received a message from Defendant Uber stating, "Sorry our driver had to cancel today."

25. Plaintiff submitted a complaint to the Department of Justice reporting the two consecutive denials of service she experienced that day.

26. Plaintiff Steele was also denied service on Thanksgiving Day, November 24, 2016. Plaintiff sought to obtain transportation to celebrate the holiday with her family and friends. Plaintiff requested transportation with Defendant Uber. The app confirmed that an Uber driver named Kingsley would arrive in approximately 13 minutes.

27. When the Uber driver arrived, he stopped before reaching the end of Plaintiff's driveway. The driver saw Plaintiff waiting for him with Goodee, Plaintiff's service animal. Goodee was on a leash and wore a vest stating "Service Dog."

28. From a distance, the Uber driver yelled to Plaintiff asking "Are you the one taking Uber with a service dog?" Plaintiff replied, "Yes, she's a service dog." The Uber driver replied "No way, I don't have a blanket for my seats." Plaintiff showed the driver she had a blanket for Goodee to sit on. Plaintiff also explained that federal law requires that he provide service to both her and her service animal. The Uber driver shook his head, said that he wasn't refusing service but that he didn't have a blanket for his seats. The Uber driver then backed out of Plaintiff's driveway and left. A few minutes later Plaintiff received a message from Defendant Uber that its driver had canceled. Plaintiff was late for the Thanksgiving celebration as she was required to obtain other transportation. Plaintiff filed a complaint to the Department of Justice reporting the denial of service.

29. A similar instance occurred December 20, 2016. Plaintiff Steele sought transportation with Defendant Uber. Plaintiff received confirmation that an Uber driver was approximately 13 minutes away. When the Uber driver arrived, he rolled down the car window and asked if Plaintiff was taking the dog. Plaintiff's service animal Goodee was on a leash and wore a vest stating "Service Dog." When Plaintiff said she was taking her service animal, the Uber driver stated, "I can't take the dog." The driver shook his head, said "No, no ma'am," and pulled out of Plaintiff's drive way. Plaintiff later received a message from Defendant Uber that its driver "had to cancel."

30. Afterwards, Plaintiff Steele called Defendant Uber's support line and reported the denial of service. Uber's representative refused to record the drivers' name and license plate number. Instead, Uber's representative told Plaintiff, ""You need to be more proactive and take a picture of the license plate so we'll have the information." Plaintiff was instructed to take a "screen shot" of her smart phone and hit the "home" button on Uber's app to forward the information to Uber. Plaintiff attempted to follow these instructions, but the information was lost. Defendant Uber took no further action to address the denial of service. Plaintiff Steele filed a complaint to the U.S. Department of Justice reporting the denial of service

31. In 2016, Plaintiff Steele was denied service by Defendant Uber because of her disability and use of a service animal on or about each of the following dates: March 4, 2016;

March 24, 2016; May 11, 2016; June 6, 2016; June 20, 2016; August 26, 2016; September 9, 2016; September 14, 2016; September 22, 2016; September 30, 2016; September 30, 2016; October 25, 2016; November 11, 2016; November 16, 2016; November 24, 2016; December 2, 2016; and December 20, 2016.

32. Defendant Uber's on-going pattern and practice of refusing to provide service to Plaintiff Steele because of her disability and use of a service animal continued throughout 2017.

33. On January 3, 2017, Plaintiff Steele was again denied service by Defendant Uber. Plaintiff used Uber's app to request a ride. Uber confirmed that a driver named Angela, in a Chevy Equinox, would arrive to pick up Plaintiff in 3 minutes. Plaintiff then sent the Uber driver a text specifying the specific location where she would be waiting.

34. A few minutes later, Plaintiff saw a Chevy Equinox pull up to the location specified by Plaintiff. The driver could see Plaintiff waiting for the driver with her service animal, Goodee, who was on a leash and who wore a vest stating, "Service Dog." As Plaintiff reached out to open the car door, the driver pulled away, circled the parking lot, and left.

35. Plaintiff attempted to call and text the driver. The driver did not respond to Plaintiff's voice message or her text. A few moments later, Plaintiff received a message from Defendant Uber stating, "Sorry our driver had to cancel today." Plaintiff was left standing there with no way home. Plaintiff filed a complaint with the Department of Justice that she had been denied service by Defendant Uber.

36. Plaintiff was again denied service by Defendant Uber on January 31, 2017. Plaintiff had again used Uber's app to request a ride. Uber's app confirmed that a driver named Ahmad would arrive in approximately 4 minutes in a Hyundai. A few minutes later the Uber driver pulled up and stopped directly in front of Plaintiff, who was standing with her service animal Goodee. Plaintiff had Goodee on a leash, and Goodee wore a vest stating, "Service Animal." As Plaintiff began to move toward the vehicle, the driver made eye contact with Plaintiff and then suddenly accelerated his car and pulled away from the loading ramp and drove away. Defendant Uber then sent Plaintiff a message stating "Sorry our driver had to cancel today." Plaintiff filed a complaint with the Department of Justice reporting the denial of service.

37. The very next day, February 1, 2017, Plaintiff was again denied service because of her disability and use of a service animal. Plaintiff complained to Defendant Uber that she had again been denied service.

38. On February 5, 2017, Plaintiff was contacted by Defendant Uber and asked to provide details regarding the denial of service she reported on February 1, 2017. Plaintiff told Defendant Uber that she had been denied service many times. Defendant Uber represented that it would address the driver that had denied service to Plaintiff on February 1, 2017. Defendant made no effort to address the previous times Plaintiff had been denied service. Further, Defendant Uber did not indicate that it would take any action to correct the continuing problem of denying service to persons who travel with a service animal. Plaintiff received no further communication from Uber regarding the February 1, 2017 denial of service.

39. Plaintiff was again denied service because of her disability and use of a service animal on February 7, 2017. Plaintiff used Defendant Uber's app to request a ride. The Uber app confirmed that an Uber driver named Santiago would arrive in approximately 10 minutes to pick-up Plaintiff. When the Uber driver arrived, the driver saw Plaintiff standing with her service animal Goodee. Plaintiff had Goodee on a leash and Goodee wore a vest stating "Service Animal." Upon seeing Plaintiff's service animal, the Uber driver asked if the dog was coming. When Plaintiff replied that she required her service dog for her disability, the driver refused to take Goodee. Plaintiff asked the Uber driver to call Uber's critical response line, but the driver refused. The driver then left. As usual, Plaintiff then received a message from Defendant Uber stating, "Sorry our driver had to cancel today." Plaintiff filed a complaint with the Department of Justice reporting the denial of service.

40. Plaintiff Steele continued to be denied service by Defendant Uber throughout the rest of 2017. During 2017, Plaintiff Steele was denied service by Defendant Uber on or about each of the following dates: January 3, 2017; January 31, 2017; February 1, 2017; February 7, 2017; September 9, 2017; September 15, 2017; October 13, 2017; November 2, 2017; and November 27, 2017.

41. In addition to the numerous times that Defendant Uber completely denied service to Plaintiff, Plaintiff has repeatedly been subjected to disparaging comments and complaints by Uber drivers who reluctantly allowed Plaintiff to travel with her service animal. Throughout 2016 and 2017 Plaintiff repeatedly dealt with drivers who complained and made disparaging comments to express their displeasure about taking Plaintiff's service animal.

42. On March 21, 2016, when the Uber driver arrived to pick up Plaintiff the driver saw that Plaintiff had a service animal. The driver told Plaintiff that he usually doesn't "haul dogs." The driver also scolded Plaintiff for not advising him about her dog before he arrived.

43. On March 30, 2016, the Uber driver initially objected to taking Plaintiff's service animal. After Plaintiff explained the importance of having her service animal with her, the driver reluctantly agreed to allow Plaintiff to ride with Goodee. However, during the trip, the Uber driver complained repeatedly that he had a fear of dogs. The driver also falsely accused Goodee of getting mud on his back seat.

44. On April 28, 2017 the Uber driver first wanted to know if Plaintiff's service animal Goodee would shed hair. Throughout the trip, the Uber driver implied that she did not believe that Plaintiff's dog Goodee was a service animal. The driver wanted to know details about how a service animal works. The driver then told Plaintiff about a family member that fakes having a service animal.

45. On October 19, 2017, the Uber driver would only take Plaintiff and her service animal if Goodee rode in the back of the driver's SUV away from Plaintiff. About two weeks later, on October 31, 2017, another Uber driver complained about having to take a "long-haired" dog in her car. The driver said she did not appreciate having to take other people's dogs in her car when Uber will not permit her to have her own dog in the car.

46. On November 3, 2017, the Uber driver agreed to take Plaintiff's service animal Goodee, but then complained that he would now have to clean the car. Uber drivers have repeatedly complained to Plaintiff about taking her service animal, citing concerns for the interior of the car, fear of dogs, and allergies.

47. Most recently, on Valentine's Day, February 14, 2018, Plaintiff requested a ride through Defendant Uber's app. The driver arrived in a pick-up truck. When the driver saw Goodee, Plaintiff's service animal, the drive said the dog could ride in the truck bed. Plaintiff objected and advised that she must remain with her service animal. In response, the driver told Plaintiff that they should both get in the back of the truck. At one point the driver tried to take the leash away from Plaintiff. After an extended conversation, the driver eventually consented to letting both Plaintiff and her service animal ride in the cab of the truck. Plaintiff reported the incident to Defendant Uber. Plaintiff later received a reply from Uber stating,"No worries, we've noted your concerns and will follow up as needed."

48. Throughout 2016 and 2017 Plaintiff complained to Defendant Uber each time she was denied service. Plaintiff also complained to Defendant Uber when a driver complained or made disparaging comments about taking her service animal. Despite Plaintiff's numerous complaints, Defendant Uber did not take Plaintiff's complaint seriously. In response to a complaint by Plaintiff, Defendant Uber replied with a text message stating, "No worries, we've noted your concerns, and are further reviewing this driver's account. We have also made sure that you will no longer be paired with this driver again, and we've issued a $5 credit to you account that can be applied to your next trip."

49. In fact, Defendant Uber failed to properly address any of Plaintiff's complaints. Defendant Uber has taken no action to remedy the repeated denials of service Plaintiff has reported, and Defendant Uber has done nothing to ensure that Plaintiff would not be denied service in the future.

50. For instance, Plaintiff complained to Defendant Uber after she was completely denied service on September 15, 2017. In response to Plaintiff's complaint, a customer service representative from Defendant Uber called Plaintiff. The customer service representative apologized to Plaintiff for the problem. Plaintiff was informed that Uber would refund the $5.00 cancellation fee Uber had charged to Plaintiff's account. Plaintiff was also told that Uber would investigate and either provide the driver with additional education or suspend the driver. Plaintiff was later informed that Defendant Uber had provided the driver with additional

information regarding the legal obligation to provide service to an individual with disability who is traveling with a service animal with a disability with service animals.

51. When Plaintiff complained to Defendant Uber that she had been denied service on October 13, 2017, Uber responded to Plaintiff with a text message stating, "We've noted your concerns, and are further reviewing this driver's account. . . . We have ensured that you will no longer be paired with this driver." Defendant Uber took no further action to ensure that individuals with a service animal would be provided service as required by law. Further, Defendant Uber did nothing to enforce compliance with its own policies regarding service to persons with disabilities who travel with a service animal.

52. Plaintiff complained to Defendant Uber again on November 3, 2017, reporting that the driver agreed to provide service to Plaintiff and her service animal but complained repeatedly that he would have to clean the car. Plaintiff received a text response from Defendant Uber stating that it had noted her concerns. Uber assured Plaintiff she would not be paired with that driver again. Uber also issued a $5 credit on her Uber account.

53. On November 27, 2017, Plaintiff reported to Defendant Uber that she had been denied service because of her need to travel with a service animal. Plaintiff reported that the, "driver pulled up saw me, saw the dog and LEFT. I then text 'are you in route' but received a text message on Uber's app stating, "our driver had to cancel today. UNACCEPTABLE DISCRIMINATION."

54. Defendant Uber responded to Plaintiff's complaint with a text stating, "We have launched in internal investigation and someone will be in contact with you as soon as possible regarding the matter. . ." In fact, no one from Uber ever contacted Plaintiff regarding her complaint. Instead, on December 3, 2017, Plaintiff received a text message from Defendant Uber stating, "Thank you so much for speaking with me on the phone and sharing the details of this reported incident. The behavior you described is not tolerated." In fact, no one from Uber had contacted Plaintiff, and Plaintiff had not spoken to anyone at Uber regarding her complaint. About two hours later, Plaintiff received another text message from Defendant Uber stating that it had closed out its investigation by providing the driver additional information regarding the

driver's legal obligations. Plaintiff alleges that in fact Defendant Uber did not investigate Plaintiff's complaint.

55. Plaintiff further alleges on information and belief that Defendant Uber does not require that drivers provide service to individuals with disabilities who travel with a service animal. Instead, drivers are asked to volunteer to take passengers with service animals. Uber gives a higher rating to drivers who volunteer than drivers who do not. Uber then matches drivers who volunteered to take service animals with ride requests from individuals traveling with a service animal. These policies and practices result in reduced service and longer wait times for individuals who travel with service animals since only those drivers who have volunteered to take service animals are available to accept the ride request.

56. Additionally, Plaintiff alleges on information and belief that Uber's app includes a rating system that Uber drivers use to rate passengers. Uber's passenger rating system operates in a manner that reduces service to individuals who travel with service animals. After each ride, the driver is able to rate the passenger on a scale of one to five. Drivers are able to view a passenger's average rating before accepting the ride. Additionally, if a driver gives a passenger a low rating, Uber does not match the driver to that passenger. Uber's passenger rating system gives drivers a means of screening-out passengers with service animals. Drivers give lower ratings to passengers with service animals than the rating given to other passengers. This enables the driver to avoid being matched with the same passengers in the future, and results in lower average ratings for passengers who travel with service animals. Since drivers prefer to pick-up drivers with higher ratings, and may choose not to accept a pick-up from a customer with a low rating. This screens-out riders who travel with a service animal, such a Plaintiff.

57. Defendant Uber's repeated denial of service and other conduct described in the preceding paragraphs of the complaint caused Plaintiff Steele extreme emotional distress. Each time Plaintiff was denied service she experienced intense anxiety and anger. Plaintiff would often begin to shake and cry. Plaintiff suffered from an ongoing sense of helplessness, abandonment, and isolation brought on by Defendants' unlawful discrimination. Plaintiff suffered from sleeplessness and nightmares. She also began suffering migraine headaches

brought on by Defendants' repeated denials of service. Plaintiff suffered this extreme emotional distress throughout 2016 and 2017. Plaintiff required medical attention from a mental health professional, which she still receives today. On at least one occasion Plaintiff was treated in the emergency department of a local hospital.

**First Cause of Action**
Violation of the Americans with Disabilities Act
42 U.S.C. §§ 12101, et seq
All Defendants

58. Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 57 of this complaint as if fully set forth herein.

59. Title III of the ADA prohibits discrimination on the basis of disability, "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The ADA further provides that discrimination includes, "a failure of a private entity which operates a demand responsive system . . . to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities." 42 U.S.C. §12182(b)(2)©.

60. The ADA's implementing regulations specify that both public and private entities, "shall permit service animals to accompany individuals with disabilities in vehicles and facilities." 42 U.S.C. § 12186(a)(1); 49 C.F.R. § 37.167(d). The regulations also require that entities operating a demand responsive system, "shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals." 49 C.F.R. § 37.173.

61. Defendant Uber and DOES 1 through 10, each violated the mandates of the ADA as more fully set forth in the preceding paragraphs of this complaint, by, among other things: refusing to provide transportation to Plaintiff Steele because of her service animal; leaving

Plaintiff stranded with no transportation home after Defendant Uber had accepted her ride request, solely because of her disability and her service animal; telling Plaintiff that her service animal could not ride in the vehicle with Plaintiff but had to ride in the back of the vehicle in the truck bed; complaining to Plaintiff Steele about taking her service animal; failing to operate its demand responsive system in a manner that ensured Plaintiff, as an individual with a disability, received the same the level of service provided to individuals without disabilities; permitting drivers to volunteer to take service animals thereby resulting in a reduced pool of drivers available to provide service to individuals with disabilities who travel with a service animal, such as Plaintiff; maintaining a passenger rating system that allowed drivers to screen out persons with disabilities and individuals traveling with a service animal; not adequately training drivers about their obligations under the ADA to provide service to persons with disabilities who travel with a service animal; failing to develop and implement a means to receive and address complaints that service had been denied because of a service animal that is readily accessible to and usable by individuals with disabilities; failing to adequately investigate Plaintiff's complaints of denial of service; and failing to take effective and timely remedial action in response to Plaintiff's complaints that she had been denied service because of her service animal.

62. Defendant Uber and DOES 1 through 10, through their acts and omissions, each knowingly and intentionally discriminated against Plaintiff on an on-going and continuing basis because of her disability in violation of Title III of the ADA. Despite Plaintiff's numerous complaints to Defendant Uber that she had been repeatedly denied service because of her service animal, Defendant Uber failed to take equitable steps to remedy the discriminatory conduct. Defendant Uber and DOES 1 through 10 will continue to engage in unlawful discrimination and deny service to individuals with disabilities who travel with a service animal, and Plaintiff Steele will continue to suffer irreparable harm because of Defendants' unlawful practices.

63. Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. § 12188 and 42 U.S.C. § 2000a-3(a), and hereby demands injunctive relief. Plaintiff asks the Court for an order directed to each Defendant, including Defendant Uber to:

(i) Ensure that in the future Plaintiff Steele and other individuals who travel with a

service animal are not denied service because of her service animal in the future;

(ii) Ensure that Plaintiff Steele, and other individuals who travel with a service animal are provided service without complaints or other disparaging comments about taking a service animal;

(iii) Fully comply with their own policies that prohibit discrimination against individuals with disabilities, including No-Tolerance or Zero-Tolerance policies against discrimination against individuals with disabilities, and policies that service be provided to persons with disabilities that travel with a service animal;

(iv) Ensure that each Defendant operates its response demand system of transportation in a manner that provides Plaintiff, and other individuals with disabilities who travel with a service animal, the same level of service as each Defendant provides to individuals without disabilities who do not travel with a service animal;

(v) Discontinue the policy and practice of permitting drivers to volunteer to take passengers who travel with a service animal and require that all drivers take passengers who travel with a service animal;

(vi) Discontinue its passenger rating system so that drivers are not allowed to screen out persons with disabilities who travel with a service animal;

(vii) Ensure that all drivers are adequately and fully trained about their obligations under the ADA to provide service to persons with disabilities who travel with a service animal;

(viii) Develop and implement a method to receive and address complaints that service had been denied because of a service animal that is readily accessible to and usable by individuals with disabilities ;

(ix) Develop and implement an effective and timely method to investigate complaints made by individuals with disabilities that service was denied because of a service animal;

(x) Fully investigate each complaint made by Plaintiff Steele that she was denied service, and inform Plaintiff of the findings or results of the investigation; and

(xi) develop and implement effective remedial action designed to stop unlawful denials of service by drivers and deter in response to Plaintiff's complaints that she had been denied service because of her service animal.

64. Plaintiff is also entitled to an award of statutory attorneys fees and costs pursuant to 42 U.S.C. § 12188 and 42 U.S.C. § 200A-3(b), and hereby demands an award of attorneys fees and costs according to proof.

**Second Cause of Action**
Texas Human Resources Code § 121.001, et seq
All Defendants

65. Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 57 above, as if fully set forth herein.

66. The Texas Human Resources Code makes it unlawful for a common carrier, airplane, railroad train, motor bus, streetcar, boat, or other public conveyance or mode of transportation operating with the state to "refuse to accept as a passenger a person with a disability because of the person's disability, nor ma a person with a disability be required to pay an additional fare because of his or her use a service animal, wheelchair, crutches, or other device used to assist a person with a disability in travel." Texas Human Resources Code §121.003(b).

67. The Texas Human Resources Code further provides that, "No person with a disability may be denied admittance to any public facility in the state because of the person's disability. No person with a disability may be denied the use of a white cane, assistance animal, wheelchair, crutches, or other device of assistance." Texas Human Resource Code § 121.003©.

68. Defendant Uber and DOES 1 through 10, each violated the mandates of the Texas Human Resources Code as more fully set forth in the preceding paragraphs of this complaint, by, among other things: refusing to provide transportation to Plaintiff Steele because of her service animal; leaving Plaintiff stranded with no transportation home after Defendant Uber had accepted her ride request, solely because of her disability and her service animal; by telling Plaintiff that her service animal could not ride in the vehicle with Plaintiff but had to ride in the back of the vehicle in the truck bed; complaining to Plaintiff Steele about taking her service animal; permitting drivers to volunteer to take service animals thereby resulting in a reduced pool of drivers available to provide service to individuals with disabilities who travel with a

service animal, such as Plaintiff; maintaining a passenger rating system that allowed drivers to screen out individuals with disabilities who travel with a service animal; not adequately training drivers about their obligations under state law to provide service to persons with disabilities who travel with a service animal; failing to develop and implement a means to receive and address complaints that service had been denied because of a service animal that is readily accessible to and usable by individuals with disabilities; by failing to adequately investigate Plaintiff's complaints of denial of service; and by failing to take effective and timely remedial action in response to Plaintiff's complaints that she had been denied service because of her service animal.

69. By violating the mandates of Texas Human Resource Code §§ 121.003(b) and 121.003©, Defendants Uber and DOES 1 through 10, each deprived Plaintiff Steele of her civil liberties and has caused Plaintiff substantial harm and loss, including severe emotional distress, as more fully set forth in the preceding paragraphs of this Complaint. Plaintiff has suffered, and continues to suffer the indignation of unlawful discrimination, the deprivation of her right to full and equal enjoyment of the transportation services offered by Defendants. Plaintiff has suffered severe mental anguish, frustration, outrage, and anxiety. Plaintiff is entitled to receive and hereby demands compensatory damages in an amount according to proof. Texas Human Resource Code §121.004(b).

70. Defendants Uber and DOES 1 through 10 each committed the acts and omissions alleged in this complaint maliciously, fraudulently and oppressively, with a wrongful intent to harm Plaintiff Steele and with an evil motive amounting to malice, and in conscious disregard for Plaintiff's right to be free from discrimination on the basis of her disability and her right to use and enjoy the transportation services offered by Defendants. Plaintiff Steele is entitled to receive an award of punitive damages from each Defendant in an amount sufficient to punish each Defendant and to deter each Defendant from engaging in such unlawful practices, in an amount according to proof.

71. Plaintiff is also entitled to, and hereby demands, an award of attorneys fees and costs according to proof.

**Third Cause of Action**
Intentional Infliction of Emotional Distress
All Defendant

72. Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 57 above, as if fully set forth herein.

73. Defendant Uber and DOES 1 through 10, each willfully and wantonly and with full knowledge and intent, harmed Plaintiff Steele by their extreme and outrageous conduct, as more fully set forth in the preceding paragraphs of this complaint. The extreme and outrageous conduct included, but was not limited to: refusing to provide transportation to Plaintiff Steele because of her service animal; leaving Plaintiff stranded with no transportation home after Defendant Uber had accepted her ride request, solely because of her disability and her service animal; telling Plaintiff that her service animal could not ride in the vehicle with Plaintiff but had to ride in the back of the vehicle in the truck bed; complaining to Plaintiff Steele about taking her service animal; failing to operate its demand responsive system in a manner that ensured Plaintiff, as an individual with a disability, received the same the level of service provided to individuals without disabilities; permitting drivers to volunteer to take service animals thereby resulting in a reduced pool of drivers available to provide service to individuals with disabilities who travel with a service animal, such as Plaintiff; maintaining a passenger rating system that allowed drivers to screen out persons with disabilities and individuals traveling with a service animal; not adequately training drivers about their obligations under the ADA to provide service to persons with disabilities who travel with a service animal; failing to develop and implement a means to receive and address complaints that service had been denied because of a service animal that is readily accessible to and usable by individuals with disabilities; failing to adequately investigate Plaintiff's complaints of denial of service; and by failing to take effective and timely remedial action in response to Plaintiff's complaints that she had been denied service because of her service animal.

74. Defendants each had full knowledge and was aware of the outrageous conduct alleged in this complaint, and knowingly permitted, condoned, or otherwise authorized or ratified the extreme and outrageous conduct.

75. As a direct and proximate cause of Defendants' extreme and outrageous conduct, Plaintiff Steele has suffered and continues to suffer sever emotional distress, including the indignation of unlawful discrimination and the deprivation of her right to full and equal enjoyment of the transportation services offered by Defendants. Plaintiff has suffered severe mental anguish, frustration, outrage, and anxiety, as more fully set forth in the preceding paragraphs of this complaint, all caused by Defendants' extreme and outrageous conduct, in an amount according to proof.

76. Defendant Uber and DOES 1 through 10 each committed the acts and omissions alleged in this complaint maliciously, fraudulently and oppressively, with a wrongful intent to harm Plaintiff Steele and with an evil motive amounting to malice, and in conscious disregard for Plaintiff's right to be free from discrimination on the basis of her disability and her right to use and enjoy the transportation services offered by Defendants. Plaintiff Steele is entitled to receive an award of punitive damages from each Defendant in an amount sufficient to punish each Defendant and to deter each Defendant from engaging in such unlawful practices, in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff D'edra Steele prays for judgment as follows:

1. For an order providing injunctive relief as provided in the preceding paragraphs of this complaint;

2. For an award of compensatory damages to compensate Plaintiff for the deprivation of her civil liberties, in an amount according to proof;

3. For an award of compensatory damages to compensate Plaintiff for the severe emotional distress, in an amount according to proof;

4. For an award of Plaintiff's costs and attorneys fees, in an amount according to proof;

5. For an award of prejudgment interest, in an amount according to proof; and

6. For such other relief as the Court may deem fair and just.

Date: Mar 16 2018

By:__________________________
Angela Alioto
John Scarpino
Attorneys for Plaintiff D'edra Steele

**JURY DEMAND**

Plaintiff Steele hereby demands a trial by jury on all issues as permitted by applicable law.

Date: Mar 16 2018

By:__________________________
Angela Alioto
John Scarpino
Attorneys for Plaintiff D'edra Steele